IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 19, 2013 Session

## STATE OF TENNESSEE v. JOSEPH H. ADKINS a/k/a JOSEPH H. MORRISON

**Appeal from the Criminal Court for Sullivan County**
**No. S54,537      Robert H. Montgomery, Judge**

_____

**No. E2012-02415-CCA-R3-CD - Filed April 17, 2014**

_____

Following a jury trial, the Defendant, Joseph H. Adkins a/k/a Joseph H. Morrison, was convicted of first degree premeditated murder; first degree felony murder; aggravated burglary, a Class C felony; and three counts of aggravated assault, a Class C felony. See Tenn. Code Ann. §§ 39-13-102, -13-202, -14-403. The trial court merged the felony murder conviction into the premeditated murder conviction and imposed a sentence of life with the possibility of parole. The trial court sentenced the Defendant to six years for each of the remaining convictions and ordered all of the sentences to be served consecutively for an effective sentence of life plus twenty-four years. In this appeal as of right, the Defendant contends (1) that the trial court erred in denying the Defendant's pro se motion to remove appointed trial counsel; (2) that the trial court erred by not allowing the Defendant to cross-examine a witness about a prior instance where the witness allegedly lied under oath; (3) that the trial court improperly allowed the admission of hearsay evidence at trial; (4) that the trial court erred by instructing the jury on flight; (5) that the evidence was insufficient to sustain the Defendant's conviction for first degree premeditated murder; (6) that the evidence was insufficient to sustain the Defendant's convictions for two of the aggravated assault charges; (7) that the trial court erred by correcting a "typographical error" on the jury's verdict form; and (8) that the trial court erred by imposing consecutive sentences.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

_____

[1]For the sake of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

Ricky A.W. Curtis, Blountville, Tennessee (at trial); and Gregory W. Francisco, Kingsport, Tennessee (at motion for new trial hearing and on appeal), for the appellant, Joseph H. Adkins a/k/a Joseph H. Morrison.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Barry Staubus, District Attorney General; and William B. Harper, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND[2]

Ruth Miller testified at trial that she was seventy-eight years old, that the Defendant was her brother's step-son, and that the murder victim, Kathy Adkins, was the Defendant's wife. Ms. Adkins and her son, Joseph Cole, moved in with Ms. Miller in early May 2007 because Ms. Adkins "had separated from" the Defendant. According to Ms. Miller, on May 25, 2007, the Defendant called her house and "was talking about killing" Ms. Adkins because "she wouldn't go back to him." The Defendant called a second time around 1:00 a.m. and again said that he wanted to kill Ms. Adkins. Ms. Miller testified that after the second phone call, Ms. Adkins called the police, that a police officer stopped by the house, and that the officer stated that he would "put additional police in the area."

Ms. Miller testified that in addition to Ms. Adkins and Mr. Cole, her grandson, Tyler Moorelock, along with Bobby Hite, Joseph Hite, and Monk Hite[3] were at her house on the night of May 25, 2007. Ms. Miller also testified that she rented a "back bedroom" to a man, Jimmy Hale, who was in the house that night as well. Sometime between 7:00 and 8:00 a.m. on the morning of May 26, 2007, Mr. Moorelock, Mr. Cole, and Bobby Hite left Ms. Miller's house. Ms. Miller testified that shortly after they left, the Defendant called for a third time. The Defendant told Ms. Miller that he "was sorry that he had called and said all that he had." The Defendant then told Ms. Miller that he "wouldn't be bothering" them anymore, but that he wanted to speak to Ms. Adkins. Ms. Miller testified that when Ms. Adkins refused to speak to the Defendant, he became angry and said "[t]hat he'd kill her."

Ms. Miller testified that she was sitting in her living room with Ms. Adkins, Joseph Hite, and Monk Hite sometime before noon when she heard Mr. Moorelock's car pull into

---

[2]This section will discuss only the factual background regarding the Defendant's convictions. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

[3]Monk Hite died prior to the Defendant's trial.

her driveway. Ms. Miller was sitting next to an oxygen tank in the left corner of the room with a small table between her and Ms. Adkins. Joseph Hite, then eleven years old, was sitting almost directly across from Ms. Adkins a few feet away. Monk Hite was seated behind the front door. Ms. Miller, Ms. Adkins, and Joseph Hite were all visible from the front door. As Mr. Moorelock, Mr. Cole, and Bobby Hite walked toward the front door, they saw the Defendant "come around the corner" of the house with "something black in his hand." When the Defendant got closer, the three realized that the black object was a gun.

The Defendant "cocked the gun back," pointed it at Mr. Cole and said, "Get you some boy." Mr. Cole testified that he was afraid for his life and that he, Mr. Moorelock, and Bobby Hite "took off running." The Defendant then kicked open the door to Ms. Miller's house and stepped into the living room. The Defendant shot Ms. Adkins three times, paused, and said, "Die, b---h, die." Ms. Adkins looked at Ms. Miller and said, "Aunt Ruth, call Mama." The Defendant then shot Ms. Adkins three more times before walking out of the house. Mr. Moorelock and Mr. Cole both testified that they saw the Defendant run towards a nearby church after the shooting stopped. Both Ms. Miller and Joseph Hite testified at trial that they were afraid when they saw the Defendant with the gun. Ms. Miller testified that the shooting happened so fast that Ms. Adkins never got out of her chair.

Mr. Cole, Mr. Moorelock, and Bobby Hite went back to Ms. Miller's house after they saw the Defendant run away. Ms. Adkins was "slumped" in the chair "with bullet holes all in her side" and bleeding. Mr. Cole testified that he tried to stop the bleeding with some towels. According to Mr. Cole, Ms. Adkins was still alive and "she was trying to talk but she couldn't." Her "eyes were rolled in the back of her head," and she was gasping for air. Mr. Cole testified that he knew Ms. Adkins owned a gun but that he did not see it in her hand or in the chair. According to Mr. Cole, while he was waiting for the police to arrive, he found Ms. Adkins's gun in her purse, and he hid it in a drawer in the "back room" of Ms. Miller's house. Ms. Miller testified that Ms. Adkins did not have her gun in her hand when she was shot. Joseph Hite also testified that he did not see Ms. Adkins with a gun during the shooting. Mr. Moorelock testified that he never saw Ms. Adkins's gun that day.

Amy Crockett testified at trial that in 2007, she lived across the street from Ms. Miller and that she could see "the side and around to the front" of Ms. Miller's house from her front porch. Ms. Crockett testified that on the morning of May 26, 2007, she saw the Defendant walking toward Ms. Miller's house from a nearby church. The Defendant was carrying a paper bag. Ms. Crockett saw the Defendant go "through [Ms. Miller's] back yard" and come around the side of her house. As the Defendant got to the front of the house, Mr. Moorelock, Mr. Cole, and Bobby Hite pulled into the driveway. Ms. Crockett testified that she heard the Defendant ask Mr. Cole, "Do you want some of this," right before he kicked open Ms. Miller's door.

Ms. Crockett testified that she saw the Defendant point a black 9 mm handgun into Ms. Miller's house and fire six shots. According to Ms. Crockett, Mr. Moorelock, Mr. Cole, and Bobby Hite "took off running" when the Defendant started shooting. Ms. Crockett testified that when the Defendant was done shooting, he walked over to the next house and then started running back to the church. Ms. Crockett saw the Defendant get into "a darker Dodge Ram type truck" and drive away in the opposite direction. Ms. Crockett testified that she went over to Ms. Miller's house and saw Ms. Adkins in a chair "gurgling" while "[e]verybody was trying to hold rags on" her. Ms. Crockett also testified that she did not see a gun in Ms. Miller's house while she was there. Ms. Crockett admitted on cross-examination that she did not have a direct view of Ms. Miller's house and that her view was somewhat obstructed.

Detective Frank Light of the Kingsport Police Department (KPD) testified that he arrived at Ms. Miller's house around 12:30 p.m. on May 26, 2007. Det. Light described Ms. Miller's house as small and that the living room was small and very "cluttered." Det. Light testified that he found four spent casings near Ms. Miller's television and three more in and around the chair Ms. Adkins was sitting in. Det. Light also found several bullet holes in the wall, baseboard, and floor behind the chair. Det. Light found a spent bullet in the wall behind the chair and a second bullet fell out when "removing [a] blanket from the victim's chair." Det. Light testified that there was no evidence in the room to suggest that any other shots had been fired other than those fired at Ms. Adkins.

Det. Light testified that he took a statement from Ms. Miller on the day of the murder. Ms. Miller did not tell him that Monk Hite was in the room when the shooting occurred or that Mr. Hale was in the back bedroom. Ms. Miller also mistakenly told Det. Light that Bobby Hite had been in the room instead of his brother, Joseph Hite. Det. Light testified that none of the witnesses told him about Ms. Adkins's gun the day of the shooting. Ms. Miller testified that she did not see Ms. Adkins's gun on the day of the shooting and did not know where it was. However, Ms. Miller testified at a preliminary hearing that Ms. Adkins had a gun underneath her leg when she was shot. Mr. Cole testified that he hid the gun to keep it in the house because he was afraid the Defendant might come back. Mr. Cole further testified that he did not tell any of the investigators about the gun because no one asked him about it.

Det. David Cole of the KPD testified that he assisted in the investigation of Ms. Adkins's murder and that he was unaware that she had a gun with her that day until after Ms. Miller testified at the preliminary hearing. Det. Cole testified that he received a 9 mm handgun from a person who claimed the gun had been sold to him by Bobby Hite. Ms. Miller and Mr. Cole both testified that they did not know who took the gun from Ms. Miller's house. Det. Cole also testified that he found a dent on Ms. Miller's front door that "looked

recent" but that he never tried to match the dent to the Defendant's shoes. Det. Cole further testified that beside the blood around Ms. Adkins's chair, he did not find any other blood spatter in the living room. Det. Cole admitted that he found red stains on Ms. Miller's oxygen tank and on a stepping stone in front of the house but that he did not take samples of these stains to be tested because he did not believe they were blood.

Doctor Teresa Campbell, an expert in forensic pathology, testified that she performed an autopsy on Ms. Adkins. Dr. Campbell testified that Ms. Adkins's cause of death was "multiple gunshot wounds" and that she recovered two bullets from Ms. Adkins's body during the autopsy. According to Dr. Campbell, Ms. Adkins had six entrance wounds and four exit wounds on her body. Ms. Adkins had a gunshot wound to "the right side of the chest," two wounds on the right side of "the pelvic area [] just above the hip," a fourth wound on the right side of her upper thigh "close to the rear end," a fifth wound "a little further back on the right side getting close[r] to the rear end," and a sixth wound "on the back of the right arm."

According to Dr. Campbell, the shot to Ms. Adkins's chest injured her "liver and the kidney and also perforated the diaphragm." The wound to Ms. Adkins's liver bled "profusely," and the hole in the diaphragm allowed the blood to fill Ms. Adkins's right chest cavity, possibly cause her lung to collapse. Dr. Campbell further opined that "none of the wounds would have been immediately incapacitating"; therefore, Ms. Adkins was likely conscious and experiencing pain for a short period of time after being shot. Dr. Campbell testified that Ms. Adkins died in the ambulance on the way to the hospital, was resuscitated at the hospital, and died a short time later "in the operating room." According to Dr. Campbell, Ms. Adkins died approximately thirty minutes after she was shot.

Dr. Campbell testified that the trajectories of the bullets through Ms. Adkins's body were not consistent with someone "sitting straight up" in a chair and being shot by a standing attacker. However, Dr. Campbell further testified that "if there's some shifting of the body, then" the trajectories would be consistent with Ms. Adkins being shot while sitting down. Dr. Campbell further testified that it was a "natural reaction" for a person to flinch and turn away when shot at. Dr. Campbell testified that she did not find any gunpowder or stippling on Ms. Adkins's clothes or her wounds. This caused Dr. Campbell to opine that Ms. Adkins had been shot from "at least two feet away or greater." Dr. Campbell also testified that the police did not ask her to check Ms. Adkins's hands for gunshot residue.

Ms. Adkins's gun, which Det. Cole recovered after Ms. Miller's testimony at the preliminary hearing, was sent to the Tennessee Bureau of Investigation (TBI) for testing along with the recovered casings and bullets. TBI Special Agent Teri Arney, a forensic scientist and expert in firearms identification, testified that Ms. Adkins's gun was a 9 mm

FEG semi-automatic pistol. Agent Arney testified that none of the casings or bullets recovered in this case were fired from Ms. Adkins's gun. However, Agent Arney concluded that all of the casings and bullets had been fired from the same gun, likely a 9 mm Luger. Both Dets. Light and Cole testified that the murder weapon was never found.

Det. Light testified that the police searched for the Defendant the day of the shooting, but were unable to find him. The next day, the Defendant's truck, "a 1995 dark green Dodge pickup" with a "blue hood," was found in a rural area of a neighboring county. Det. Light testified that the Defendant's truck was on a ten-acre tract of land in an area "that had been sort of cleared but yet there was undergrowth and brush." A search of the Defendant's truck revealed no weapons, blood, or evidence that the Defendant had been injured during the shooting. The Defendant surrendered to Det. Light two days after the shooting. When the Defendant was arrested he had a cell phone and two receipts from a Walgreens in Michigan. Video surveillance from the store showed that the Defendant was in Michigan the day after the shooting.

Based upon the foregoing evidence, the jury convicted the Defendant of first degree premeditated murder for the death of Ms. Adkins, first degree felony murder for the death of Ms. Adkins, aggravated burglary of Ms. Miller's home, and aggravated assault with respect to Mr. Cole, Ms. Miller, and Joseph Hite. The trial court merged the felony murder conviction into the premeditated murder conviction and imposed a sentence of life with the possibility of parole. The trial court sentenced the Defendant to six years for the aggravated burglary conviction and each of the aggravated assault convictions. The trial court ordered all of the Defendant's sentences to be served consecutively, for an effective sentence of life plus twenty-four years.

## ANALYSIS

### *I. Motion to Remove Appointed Counsel*

The Defendant contends that the trial court erred in denying his pro se motion to remove appointed trial counsel. The Defendant argues that the trial court failed to conduct a hearing or rule on the motion prior to trial. The Defendant further argues that "his trial counsel treated him in a manner which was demeaning and disrespectful," but he cautions that he is not raising a claim of ineffective assistance of counsel. The State responds that the record belies the Defendant's claim that the trial court did not hold a hearing and rule on his motion prior to trial. The State further responds that the trial court did not abuse its discretion in denying the Defendant's pro se motion.

More than two months prior to trial, the Defendant filed a pro se motion requesting that the trial court remove his appointed trial counsel and appoint a new attorney to represent him. The majority of the Defendant's motion claimed that trial counsel had "not shown any interest in providing [him] with zealous representation" and failed to properly investigate the case, as well as prepare for trial. The motion also stated that the Defendant had "no confidence" that trial counsel had "any respect for him as a client."

When this issue was raised at the motion for new trial hearing, the trial court stated that it had "looked at the docket card" earlier that morning and that "[a]t one point in time I did deal with the issue of [the Defendant's] request to relieve [trial counsel] . . . and I denied that." The trial court further stated that it "didn't see anything" during the trial that caused it "to think that the relationship of [the Defendant] and [trial counsel] had deteriorated to the point that [trial counsel] could not provide the appropriate defense for [the Defendant] or that they were unable to communicate with each other during the course of the trial."

At the outset, we note that the Defendant has failed to include transcripts for any pretrial motion hearings in the record before us. The appellant bears the burden of having a transcript prepared such "as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Failure to include the necessary transcripts for our review forces this court to "conclusively presume that the ruling of the trial judge was correct." State v. Draper, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). As such, we must presume that the trial court's statements at the motion for new trial hearing were correct and that a hearing was held on the Defendant's motion and that the motion was denied.

With respect to the Defendant's argument that the motion should not have been denied because trial counsel had been demeaning and disrespectful to him, both the United States and the Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of counsel at trial. U.S. Const. amend VI; Tenn. Const. art. I § 9. However, this right "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000). Put another way, the "essential aim" of the right to counsel "is to guarantee an effective advocate, not counsel preferred by the defendant." Id.

To that end, trial courts have wide discretion regarding the appointment and relief of counsel for indigent defendants, and a trial court's decision in such a matter "will not be set aside on appeal unless it is shown that there was a plain abuse of that discretion." State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). To be successful on a motion to remove counsel, a defendant must show that "(a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of

defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there had been a complete breakdown in communications between them." State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991).

Here, the trial court stated at the motion for new trial hearing that it did not observe anything during the trial to cause it "to think that the relationship of [the Defendant] and [trial counsel] had deteriorated to the point that [trial counsel] could not provide the appropriate defense for [the Defendant] or that they were unable to communicate with each other during the course of the trial." Nothing in the record before us contradicts the trial court's assessment or to suggest that the Defendant was prejudiced by trial counsel's representation. Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to remove appointed trial counsel.

*II. Cross-Examination of Ms. Miller*

The Defendant contends that the trial court erred by not allowing him to cross-examine Ms. Miller about a prior instance when she allegedly lied under oath. The Defendant argues that he presented proof to the trial court that Ms. Miller lied during a sentencing hearing for her grandson in 2002. According to the Defendant, the trial court's decision denied him the opportunity to impeach Ms. Miller regarding her bias and character for truthfulness. The State responds that the Defendant failed to establish that a reasonable factual basis existed for the inquiry; therefore, the trial court did not err by refusing to allow the Defendant to question Ms. Miller about her 2002 testimony.

Prior to trial, the Defendant filed a motion to impeach Ms. Miller regarding two specific incidents: one when Ms. Miller lied to the police in 2001 regarding her grandson's whereabouts and another when Ms. Miller allegedly lied under oath during her grandson's sentencing hearing in 2002. The trial court conducted a jury-out hearing on this motion just before the start of the trial. At the hearing, the Defendant submitted an audio recording of the 2002 sentencing hearing. The judge at the 2002 sentencing hearing stated that Ms. Miller "technically [] did tell the truth." The trial court concluded that Ms. Miller's 2002 testimony may have been confused or not "straightforward" but that it did not consider it to be "an unequivocal lie on the stand."

The trial court granted the Defendant's motion with respect to Ms. Miller's statements to the police in 2001 but denied the motion with respect to her 2002 testimony concluding that a reasonable factual basis did not exist for that inquiry. At trial, Ms. Miller admitted during cross-examination that she gave false information to the police in order to protect her grandson. Ms. Miller was also questioned during cross-examination about whether she was

biased against the Defendant because she believed that the Defendant had murdered her son in the early 1980s.

The Defendant has failed to include either a copy of the audio recording of the 2002 sentencing hearing or a transcript of the hearing in the appellate record. Again, it is the duty of the appellant "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues that form the basis of the appeal." State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). In the absence of an adequate record on appeal, we "must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). As such, we must accept the trial court's assessment of Ms. Miller's 2002 testimony that she did not lie at the sentencing hearing.

Tennessee Rule of Evidence 608(b) provides that a witness may be questioned regarding specific instance of conduct "for the purpose of attacking . . . the witness's character for truthfulness." "[U]pon request" the trial court must hold a jury-out hearing to "determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry" prior to questioning regarding a specific instance of conduct. Tenn. R. Evid. 608(b)(1). Here, the trial court conducted a jury-out hearing and concluded that no reasonable factual basis existed for the inquiry because Ms. Miller had not actually lied during the 2002 sentencing hearing. As such, Ms. Miller's 2002 testimony was not a specific instance of conduct probative of her character for truthfulness under Rule 608(b). Therefore, we conclude that this issue has no merit.

*III. Hearsay Evidence*

The Defendant contends that the trial court improperly allowed the admission of hearsay evidence at trial. The Defendant argues that testimony at trial from a KPD patrol officer who testified that he responded to a call from Ms. Adkins in the early morning hours of May 25, 2007, that Ms. Adkins appeared to be nervous, and that he ordered extra patrols in the area to look for the Defendant was hearsay. The Defendant further argues that this evidence was also inadmissible because it was not relevant. The State responds that the officer's testimony was not hearsay because it "did not relay a statement by a non-testifying declarant." The State further argues that, even if the trial court erred in admitting the testimony, the error was harmless.

The State's last witness at trial was Officer Nathan Elliott of the KPD. Officer Elliott testified that he responded to a call from Ms. Miller's house at approximately 1:30 a.m. on the morning of the shooting. Officer Elliott testified that he spoke to Ms. Adkins and noticed that Ms. Miller and "several juveniles [were] in the house." According to Officer Elliott, Ms.

Adkins appeared to be "very nervous and very aware of her surroundings." Officer Elliott testified that he would describe Ms. Adkins as being "apprehensive" that morning. Officer Elliott further testified that after speaking with Ms. Adkins, he ordered additional patrols near Ms. Miller's house.

The Defendant did not object to any of the testimony described above. However, a jury-out hearing was conducted after Officer Elliott testified that he ordered additional patrols around Ms. Miller's house. During the hearing, the Defendant objected to the State's follow-up question of who the extra patrols were searching for on the grounds that the answer was hearsay. Defense counsel emphasized that he was only objecting to that single question. The trial court overruled the Defendant's objection, and Officer Elliott testified to the jury that the additional patrols were searching for the Defendant. At no point did the Defendant raise a relevancy objection to any part of Officer Elliott's testimony.

At the outset, we note that the Defendant's failure to raise a contemporaneous objection to Officer Elliott's testimony regarding his perceptions of Ms. Adkins and the assignment of additional patrols to the area has waived our review of this issue. See Tenn. R. Evid. 103(a)(1) (stating that error "may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected" and "a timely objection . . . appears of record, stating the specific ground of objection"). Likewise, the Defendant's failure to raise a contemporaneous objection to the relevancy of Officer Elliott's testimony has waived our review of that issue as well. Id.

Instead, our review will focus solely on the issue of whether Officer Elliott's testimony that the additional patrols were searching for the Defendant constituted hearsay. "Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The issue of whether a trial court erred in admitting hearsay evidence is "a pure question of law" which we examine under a de novo standard of review. State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010).

Officer Elliott's testimony that the additional patrols were searching for the Defendant was not an oral or written assertion, rather it was nonverbal conduct. Nonverbal conduct is only considered a statement for hearsay purposes if the declarant intends for the conduct to be an assertion. For example, a defendant's flight from a crime scene is not considered hearsay because the defendant is "obviously not intending to assert guilt by flight." Tenn. R. Evid. 801, Advisory Comm'n Cmt. Here, there is no evidence that Officer Elliott or the

additional patrols intended their conduct to be an assertion. Accordingly, we agree with the State that Officer Elliott's testimony was not hearsay because it did not relay a statement by a non-testifying declarant.

Furthermore, any error in the trial court's admission of Officer Elliott's testimony would ultimately be harmless given that Ms. Miller testified, with no objection from the Defendant, that the Defendant called her house that morning and threatened to kill Ms. Adkins, that Ms. Adkins then called the police, that a police officer stopped by her house, and that the officer agreed to "put additional police in the area." See Tenn. R. App. P. 36(b). Accordingly, we conclude that this issue is without merit.

*IV. Flight Jury Instruction*

The Defendant contends that the trial court erred by instructing the jury on flight. The Defendant argues that there was no evidence to support that he fled the scene and later fled the state, in an attempt to evade arrest. The State responds that the Defendant has waived full appellate review of this issue by failing to include a copy of the jury instructions in the appellate record. The State further responds that the evidence was sufficient to warrant a jury instruction on flight.

The Defendant has failed to include a copy of the jury instructions in the record before us. The only references to the flight instruction in the record are the argument of counsel regarding whether it was warranted in this case and the trial court's statement that it would give the "standard" instruction on flight. Once again, it is the duty of the appellant "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues that form the basis of the appeal." Taylor, 992 S.W.2d at 944. Failure to include the necessary documents for our review forces this court to "conclusively presume that the ruling of the trial judge was correct." Draper, 800 S.W.2d at 493.

Additionally, a defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). As such, in determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). Therefore, failure to include a complete copy of the jury instructions in the appellate record waives our review of whether a particular instruction was warranted. State v. William Ray Boatwright, No. E2012-00688-CCA-R3-CD, 2013 WL 775787, at *8 (Tenn. Crim. App. Feb. 28, 2013), perm. app. denied, (Tenn. June 12, 2013).

-11-

Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate. The doctrine of plain error only applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error review is not appropriate here because the Defendant has failed to show that a clear and unequivocal rule of law has been breached. A jury instruction on flight is warranted where there is proof of "both a leaving of the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). Here, the Defendant fled the scene, drove his truck to another county where he abandoned it in a secluded area, and then fled to Michigan. Accordingly, we conclude that this issue is devoid of merit.

## V. Sufficiency of the Evidence

### A. Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

*B. First Degree Premeditated Murder*

The Defendant contends that the evidence was insufficient to sustain his conviction for first degree premeditated murder. The Defendant argues that the State failed to prove premeditation. The Defendant further argues that the evidence established that he was enraged when Ms. Adkins refused to speak to him on the phone that morning and "immediately exploded into the actions which resulted in [her] death, . . . clearly reflect[ing] an impassioned rage, without the exercise of judgment or reflection." The State responds that the evidence was sufficient to sustain the Defendant's conviction.

-13-

As relevant here, first degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Here, the Defendant called Ms. Miller's house two times the night before to state that he wanted to kill Ms. Adkins. The Defendant called a third time on the morning of the shooting and, after Ms. Adkins refused to speak to him, again threatened to kill her. The Defendant then drove to a nearby church, parked his truck, and walked down the street toward Ms. Miller's house. According to Ms. Crockett, the Defendant concealed his gun in a paper bag. The Defendant approached Ms. Miller's house from the rear. The Defendant kicked open Ms. Miller's front door, shot Ms. Adkins three times, paused to exclaim, "Die, b---h, die," and then shot her three more times. The Defendant then fled the scene and, ultimately, fled the state. The murder weapon was never recovered.

The Defendant's argument is essentially that the evidence could have been interpreted differently to view his actions as having occurred in "an impassioned rage." The Defendant could have argued this interpretation to the jury. However, in light of the foregoing evidence, the jury was free to reject this interpretation. In reviewing the sufficiency of the

evidence, this court does not reweigh or reinterpret the evidence. Instead, we determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. Based upon the foregoing, we conclude that the evidence was sufficient to establish the element of premeditation and sustain the Defendant's conviction for first degree premeditated murder.

*C. Aggravated Assault*

The Defendant contends that the evidence was insufficient to sustain his convictions for two of the aggravated assault counts. The Defendant concedes that the evidence was sufficient to sustain his aggravated assault conviction with respect to Mr. Cole. However, the Defendant argues that "the record [is] empty with respect to any action by [him] directed toward either" Ms. Miller or Joseph Hite which would constitute an aggravated assault. The State responds that the evidence was sufficient to sustain the aggravated assault convictions.

As pertinent to this review, "aggravated assault" is defined as the intentional or knowing commission of an assault involving "the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). One of the statutory definitions of "assault" is intentionally or knowingly causing "another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). A person acts intentionally with respect to the result of their conduct "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts knowingly with respect to the result of their conduct "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The evidence at trial established that the Defendant kicked open Ms. Miller's front door, displayed a gun, and fired six shots at Ms. Adkins. Ms. Miller's living room was described as small and "cluttered." Ms. Miller had an oxygen tank in use at the time of the shooting. It was also clear from the evidence at trial that all three victims were visible from the front door and that the Defendant was a few feet away from each of the victims when he fired his gun.

The Defendant argues that the evidence was insufficient because there was "no action by [him] directed toward either" Ms. Miller or Joseph Hite. However, "the statute only requires that the gun be displayed to the victim" and not directly pointed at the victim as the Defendant's argument suggests. State v. Christopher Max Hall, No. M1998-00180-CCA-R3-CD, 2000 WL 298592, at *2 (Tenn. Crim. App. Mar. 23, 2000), perm. app. denied, (Tenn. Nov. 6, 2000). Based upon the foregoing evidence, a jury could infer that the Defendant was aware that his conduct was reasonably certain to cause the victims to reasonably fear imminent bodily injury. Cf. State v. Wilson, 924 S.W.2d 648 (Tenn. 1996) (reversing an

aggravated assault conviction where the defendant fired into a house without knowing whether anyone was inside). Accordingly, we conclude that the evidence was sufficient to sustain the aggravated assault convictions at issue.

*VI. Error in Verdict Form*

The Defendant contends that the trial court erred by correcting a "typographical error" on the jury's verdict form. The Defendant notes that the original verdict form incorrectly listed the offense of first degree felony murder committed in perpetration of a robbery rather than the offense of burglary as charged in the presentment. The Defendant argues that the trial court erred by giving the jury a corrected verdict form and sending it back "to mark" its verdict on the corrected form. The State responds that the Defendant has waived appellate review of this issue by failing to make a contemporaneous objection to the trial court's action and that the trial court's correction of a "typographical error" on the verdict form did not amount to reversible error.

As the jury rendered its verdict, the jury foreman stated that the jury had found the Defendant guilty of first degree murder in perpetration of a robbery. The trial court then attempted to correct the foreman that the charge was first degree murder in perpetration of a burglary, and the jury foreman stated that the verdict form listed the offense as being in perpetration of a robbery. The trial court then consulted counsel for the Defendant and the State three times while the jury concluded rendering its verdict. The trial court noted that the verdict form was inconsistent with the presentment and its jury instructions.[4] The trial court decided to prepare a corrected verdict form and to send the jury back to "mark their verdict on [it] to conform with [its] instructions and the presentment." The jury then returned a verdict of guilty for the charged offense on the corrected verdict form. At no point did the Defendant object to the trial court's actions regarding the verdict form.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant failed to raise a contemporaneous objection during the trial court's discussion regarding correction of the verdict form. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Our supreme court has specifically stated that failure to raise a contemporaneous objection to errors involving the verdict form results in waiver of the issue. State v. Davidson, 121 S.W.3d 600, 618 n.11 (Tenn. 2003).

---

[4]Again we note that the Defendant has failed to include a copy of the jury instructions in the record for our review.

Nor is plain error review of this issue appropriate. The trial court "has both the power and the duty to require that the jury correct or amend an improper or incomplete verdict." Jones v. State, 569 S.W.2d 462, 464 (Tenn. 1978). The Defendant has cited to no authority, and we are aware of none, that the trial court's correction of the "typographical error" on the verdict form constituted reversible error. Therefore, the Defendant has failed to show that "a clear and unequivocal rule of law" has been breached. Page, 184 S.W.3d at 230. Additionally, by failing to include a copy of the jury instructions in the appellate record, the Defendant has failed to provide this court with a record that "clearly establish[es] what occurred in the trial court." Id. Accordingly, we conclude that this issue is without merit.

*VII. Consecutive Sentencing*

The Defendant contends the trial court erred by imposing consecutive sentences, for an effective sentence of life plus twenty-four years. The Defendant does not challenge the trial court's findings that he met three of the statutory grounds allowing for the application of consecutive sentences.[5] Rather, the Defendant argues that the total effective length of his sentence was excessive and not reasonably related to the severity of the offenses involved. The State responds that the trial court did not abuse its discretion in imposing consecutive sentences in this case.

Our supreme court has recently clarified that a trial court's imposition of consecutive sentences is reviewed by this court for an abuse of discretion and that "the presumption of reasonableness applies" giving "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. James Allen Pollard, --- S.W.3d ---, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *9 (Tenn. Dec. 20, 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court found that three of the statutory grounds listed in section 40-35-115(b) applied, and the Defendant does not challenge the trial court's application of these grounds. As such, the trial court's imposition of consecutive sentences is presumed reasonable. The Defendant argues that the effective length of his sentences was excessive and not reasonably related to the severity of the offenses involved. However, the Defendant

---

[5]The trial court found that the Defendant was an offender whose record of criminal activity was extensive, that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, and that the he committed these offenses while on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (4), (6).

killed Ms. Adkins by shooting her six times after calling Ms. Miller's house three times to threaten to kill Ms. Adkins. In approaching Ms. Miller's house to kill Ms. Adkins, the Defendant threatened Mr. Cole with his gun. The Defendant then entered Ms. Miller's small, "cluttered" living room and fired six shots while the then seventy-six-year-old Ms. Miller and eleven-year-old Joseph Hite were mere feet away from the Defendant and the victim. Based upon the foregoing facts, the total effective length of the sentences alone is not enough to overcome the presumption of reasonableness. Accordingly, we conclude that the trial court did not abuse its discretion in imposing consecutive sentences in this case.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE